Filed 11/30/21  P. v. Felder CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>FREEMAN ALLAN FELDER,<br><br>Defendant and Appellant. | C086481<br><br>(Super. Ct. No. STKCRFDV20170001090 ) |

A jury found defendant Freeman Allan Felder guilty of eight counts involving acts of domestic violence, including two counts of false imprisonment, corporal injury, criminal threats, threatening a witness, and robbery.  He was sentenced to a 29-year eight-month aggregate term.

In multiple rounds of supplemental briefing, defendant raises seven contentions on appeal:  (1) the trial court erred in failing to instruct the jury on the lesser included offense of attempted criminal threats; (2) he was improperly convicted of two duplicative

1

counts of false imprisonment; (3) punishment for threatening a witness must be stayed under Penal Code section 654[1]; (4) remand is required in light of Senate Bill No. 1393 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1013, §§ 1-2) (SB 1393); (5) his prior prison term section 667.5 enhancement must be struck under Senate Bill No. 136 (2019-2020 Reg. Sess.) (Stats. 2019, ch. 590, § 1) (SB 136); (6) remand is required for an ability to pay hearing in light of *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*); and (7) his trial counsel rendered ineffective assistance in failing to investigate and pursue evidence that the victim had previously made false accusations against defendant.

The second and fifth contentions have merit. We will strike one false imprisonment conviction as well as the prior prison term enhancement. We otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### Prior Acts of Domestic Violence

The victim is the mother of defendant's son, and they had dated for four or five years. During that time, defendant committed acts of domestic violence against the victim which she reported.

In 2012, they got into an argument in the bedroom, and defendant kicked and started hitting her. She managed to break free, before her mother came into the bedroom. The victim then left and got a knife. She returned to see that defendant had pushed her mother in the closet and was "bending over towards the closet…." The victim stabbed defendant, then ran to a neighbor's house and called the police. Defendant eventually entered into a plea agreement, and the two broke up for a couple months but got back together.

---

[1] Undesignated statutory references are to the Penal Code.

In 2016, during another argument, defendant choked the victim with both hands. He then let go and punched her in the head, leaving a lump. She called the police and later testified against him at a preliminary hearing. Defendant ended up in custody.

**The Charged Incident**

In early 2017, the victim was notified that defendant was being released from custody. After that, she started getting calls from defendant telling her he was out and to come and get him. At first, she didn't answer his many calls as they left her "shock[ed]" and "nervous." But she eventually answered the phone and, after hanging up several more times, decided to pick defendant up.

She drove to meet defendant at a bus station. Defendant got in her car, and they drove to pick up defendant's son from a previous relationship. Along the way, an argument erupted. Defendant was angry he could not see his other son, who was visiting a relative out of town. Defendant punched the victim in the eye several times. At trial, the victim testified she was afraid while they were arguing because "it almost always turned into something else."

After picking up defendant's son, they drove to a restaurant. Inside the restaurant, the victim told defendant she had no money. Defendant got upset and took her iPhone and snapped it in half.

Outside the restaurant, defendant took the keys from the victim and said he would drive. In the car, defendant asked her why she had no money, then proceeded to punch her in the eye several more times. The victim blacked out for several minutes and woke to defendant cussing and screaming. Defendant told her to look at his son in the back seat. When she did, defendant said to his son, " 'This is what happens to stupid bitches.' "[2] Defendant's son, who was then 10 years old, put his head down.

---

[2] The son later reported to his mother that defendant hit the victim causing her eye to swell up. He also reported that defendant broke her phone at the restaurant.

They then dropped off defendant's son at the son's home. The victim testified that she was "numb," her lip was "busted," and her eye was swollen shut. Defendant then drove them to the victim's apartment.

At the victim's apartment, defendant went through her mail and purse. He took her debit card and social security card, and he made the victim collect her and her son's shoes, saying he needed money. She testified there were at least 60 pairs, costing between $80 and $200.

That night they argued more, and at some point, he brought her a bag of frozen vegetables for her eye. Defendant also took and kept the victim's other phone. When she told him she needed to call and check on her son, he ignored her.

When the victim wanted to sleep, defendant made her sleep on the floor. He slept on the couch. The victim testified she believed defendant had barricaded the door, possibly with a chair, to keep her from leaving.[3]

In the morning, defendant woke her with a kick, and said he had to check in with his probation officer.[4] Defendant had started putting her possessions in the car. When she objected, he pushed her head to the ground and said, " 'Stop asking me questions.' " She finished gathering the shoes. They then took two of her TVs down to the car, and defendant told her to stay in the car. Defendant then went and got another load.

At some point that morning, defendant said to the victim, " 'If you call the police, I'll kill you.' " He also told her multiple times that she wasn't going to see her son, which she took to be a threat to kill her. She testified that she took the threat seriously and was afraid.

_____

[3] On cross-examination, defense counsel introduced preliminary hearing testimony during which the victim had answered no when asked if the apartment was barricaded.

[4] In his appellate briefing defendant states that the parties agreed to use the term probation, but he was actually on parole.

When the car was packed, defendant drove them both to a pawnshop. Together, they carried the TVs and a speaker to the upstairs pawnshop. Defendant told the victim to wear a hoodie to cover her face, and she did as she was told. At one point, the victim returned to the car by herself to get a TV remote left in the car.

Asked why she didn't try to get help, she testified, "[b]ecause I knew [defendant] would run,"[5] and she feared he would come back and attack her. At another point, in the pawnshop, the victim hugged defendant. Asked why, she testified it was to "reassure him that I wasn't going to leave," so that he would take her to the probation office with him. She thought she would have an opportunity to leave at the probation office.

The pawnshop transaction concluded with the victim signing papers (she was the only one with identification) and she was paid around $180 for the TVs. She gave defendant the money. Her shoes were not pawned.

From the pawnshop, defendant drove the victim to the probation office. In the parking lot, she told defendant she needed to call her mother. Defendant told her to put the call on speaker phone and tell her mother she was okay. She did.

After the call, defendant said, " 'I'll be right back' " and went inside the probation office, leaving the victim in the car. A couple of minutes later, she got out of the car, found a hiding spot, and used a cell phone defendant had left in the car to call the probation office. She was told to call the police.

The victim then called 911, and a recording of the call was played for the jury. In the recording the victim told the dispatcher, "I am hiding and my boyfriend is actually in the probation office checking in." She repeatedly urged them to hurry: "Please hurry before he leaves." And she described her situation and injuries: "he just beat me up last night and he has been holding me hostage"; "[h]e beat me up really bad"; and "[h]e said

_____

[5] On cross-examination, the victim agreed that she made no attempt to escape during the night, during the morning, or at the pawnshop.

if I called the police he's going to kill me." Asked if she needed medical attention, she said, "Yes I do. My whole eye is closed."

When police arrived, defendant was arrested, and the victim was taken to the hospital. By trial, the victim had had two surgeries to repair her eye, and two more were scheduled.

## Verdicts and Sentencing

The jury found defendant not guilty of kidnapping, but guilty of the lesser offense of false imprisonment (§ 236; count 1); corporal injury to the parent of child (§ 273.5; count 2), with a finding of personal infliction of great bodily injury involving domestic violence (§ 12022.7, subd. (e)); criminal threats (§ 422, subd. (a); count 3); threatening a witness[6] (§ 140, subd. (a); count 4); first degree robbery (§ 211; count 5); false imprisonment (§ 236; count 6); misdemeanor child abuse (§ 273, subd. (a)(b)); count 7); and misdemeanor violation of a criminal protective order (§ 166, subd. (c)(1); count 8).

The trial court separately found defendant had suffered a prior strike conviction for felony attempted second degree robbery, as well as a prior domestic violence conviction.

The trial court imposed an aggregate 29-year eight-month term, calculated as follows: ten years for corporal injury with a prior (the upper term, doubled for the strike) along with a five-year domestic violence related great bodily-injury enhancement; one year four months for each of the two false imprisonment counts (one-third the midterm, doubled for the strike); one year four months for criminal threats (one-third the midterm, doubled for the strike); two years for threatening a witness (one-third the midterm, doubled for the strike); two years eight months for first degree robbery (one-third the

---

[6] As to count 4, the jury made a special finding that the threats to a witness occurred (1) when defendant pushed the victim's head to the ground; (2) when he threatened her that she would never see her son again; and (3) when he threatened to sell her possessions.

6

midterm, doubled for the strike); a five-year prior serious felony enhancement, and a one-year prior prison term enhancement. The court also imposed 30 days each for the misdemeanor convictions, which the court said were "pretty much time served."

The court also imposed a $10,000 restitution fine (§ 1202.4), a stayed $10,000 parole revocation fine (§ 1202.45), a $240 conviction assessment (Gov. Code, § 70373), a $320 operations assessment (1465.8), and a $10 theft crime fee (§ 1202.5).

## DISCUSSION

### I. Attempted Criminal Threats Instruction

On appeal, defendant contends that, as to his criminal threats conviction, the trial court erred in failing to sua sponte instruct the jury on the lesser included offense of attempted criminal threats. He argues that a criminal threats conviction requires the victim to be in sustained fear for her own safety, but an attempted criminal threat can occur where the threat does not actually put the victim in sustained fear for her safety.[7] Defendant argues this was the case here.

He points to the victim's testimony on cross-examination that she made no effort to leave or seek help after defendant threatened to kill her if she called the police, even though defendant left her alone in her car outside the apartment, and let her walk to and from the pawnshop alone. He also cites the victim contacting defendant after his arrest. He maintains the victim's conduct was inconsistent with fear, which triggered the court's duty to instruct on attempted criminal threats. We disagree.

---

[7] "[I]f a defendant . . . acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat." (*People v. Toledo* (2001) 26 Cal.4th 221, 231.)

7

"A trial court must instruct a jury on lesser included offenses when the evidence raises questions regarding whether every element of a charged offense is present." (*People v. Vargas* (2020) 9 Cal.5th 793, 827.) But no such obligation exists when "there is no evidence that the offense was less than that charged." (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) On appeal, we independently review whether an instruction on a lesser included offense was required. (*People v. Souza* (2012) 54 Cal.4th 90, 113.)

Here, the evidence did not give rise to an obligation to instruct on attempted criminal threats. Defendant relies on the victim's failure to escape earlier, but the evidence indicates the victim made no escape attempt because she was in sustained fear. The victim testified that she was indeed afraid and took defendant's threat to kill her seriously. She also testified that she did not try to escape because she feared defendant would run away and then come back to attack her. It was only at the probation office, where she knew police were nearby, that she strategically determined she could successfully summon help. And even then, she did so only after hiding. That the victim feared retaliation was further evidenced by the fact that before the first purported escape opportunity, defendant had punched her to the point of blacking out.

The circumstances do not raise a question of whether the victim was in sustained fear. Nor does the fact that she contacted defendant after his arrest. First, the element of sustained fear does not require that the fear be never ending. "Sustained fear occurs over 'a period of time "that extends beyond what is momentary, fleeting, or transitory." ' [Citation.] 'Fifteen minutes of fear . . . is more than sufficient to constitute "sustained" fear for purposes of . . . section 422.' " (*People v. Wilson* (2015) 234 Cal.App.4th 193, 201.) The jury was properly instructed on this element. Second, if anything, the phone call suggests the control defendant wielded over her. Any suggestion that the victim was not in sustained fear for the requisite period of time is speculation and insufficient to obligate a sua sponte instruction on the lesser included offense.

## II. The Two False Imprisonment Counts

Defendant next contends that one of his two convictions for false imprisonment (counts 1 and 6) must be reversed because false imprisonment is a continuing offense and therefore one of the counts is duplicative of the other.

The People respond that while false imprisonment is a continuing offense, the jury could have reasonably concluded the victim's detention was severed when defendant fell asleep on the first day. The jury could also have concluded the victim's detention was severed the following morning when defendant left her alone in the car outside her apartment, as he went back and forth loading the car.

We agree with defendant.

### A. Additional Background

During closing argument, the prosecutor told the jury that count 1, the kidnapping offense, to which the lesser offense of false imprisonment was found, occurred during the drive on the second day. And the count 6, false imprisonment offense, occurred at the victim's apartment, the night before. As to count 6, the prosecutor argued the victim "did not feel free to leave the apartment. That's what she told us, and that's something you can infer. If she felt free to leave, of course she would have gone and left and gone to a doctor."

The prosecutor went on to argue: "[P]lease don't start thinking when you evaluate about how afraid she was, 'Well, you know, I think I would have been able to make a run for it. I would have done it. She should have tried.' You . . . have to consider what she has been through. … So if you think that she should have had the courage to try to run after getting beat up, after years — or two — at least two times that we know of, abuse and these threats, then that's not fair."

### B. Analysis

Here, nothing severed the course of conduct giving rise to separate detentions supporting two false imprisonment convictions. The victim testified that the door was

9

barricaded at night. She also testified that she feared if she tried to escape, defendant would run away and come back to hurt her. Moreover, any conclusion that the victim was free to leave, runs counter to the prosecution's theory that the victim was too afraid to leave at any point up until the probation office. We therefore find it highly improbable that the jury would nevertheless find the offense severed because the victim had the opportunity to escape — particularly where the jury was never instructed on the issue of whether the detention was continuous.

We will therefore strike the conviction on Count 6, false imprisonment.

### III. Section 654 -- Threatening a Witness and Robbery

Defendant contends punishment for his conviction for threatening a witness must be stayed pursuant to section 654. He argues insufficient evidence supported the trial court's conclusion that the conviction was severable from his robbery conviction. He reasons that as to the threatening a witness count, the jury made special findings that force, or threat of force, or threat to take property, occurred in three instances: (1) where defendant pushed the victim's head to the ground, (2) where he threatened that she would never see her son again, and (3) where he threatened to sell her possessions.[8] He argues these acts were either in furtherance of the robbery or to resist the victim's attempts to retake her property. Therefore, according to defendant, substantial evidence did not support the trial court's conclusion that count 4 was severable.[9] We disagree.

Though a person may be convicted of more than one crime for the same act, section 654 proscribes multiple punishments for the same act. (§§ 654, 954; *People v.*

---

[8] Four theories of threat were set forth on the special verdict form. The jury found not true the following threat theory: "[W]hen the Defendant used force to punch the victim in the sizzler parking lot."

[9] When sentencing on count 4, threating a witness, the court stated, "I'm gonna make that consecutive, given the severable nature of the conduct."

*Correa* (2012) 54 Cal.4th 331, 337 (*Correa*).) An " 'act' " can include a " ' "course of conduct." ' " (*Correa,* at p. 335.)

When a course of conduct causes multiple offenses — each capable of being independently committed — section 654's application turns on whether each conviction was based on a separate and divisible transaction. (*Neal v. State of California* (1960) 55 Cal.2d 11, 19.) Whether a course of conduct is divisible turns on the defendant's intent and objective. (*Ibid*.) "If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Correa, supra*, 54 Cal.4th at p. 336.) But if a defendant entertained multiple objectives — independent of and not merely incidental to each other — multiple punishment is permitted even if the violations shared common acts or were parts of an otherwise indivisible course of conduct. (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1134.)

A trial court's finding that a defendant held multiple criminal objectives will be upheld if supported by substantial evidence. (*People v. Herrera* (1999) 70 Cal.App.4th 1456, 1466.) If the trial court makes no express section 654 findings, we consider whether substantial evidence supports an implied finding of a separate intent and objective. (*People v. Islas* (2012) 210 Cal.App.4th 116, 129.) "To determine whether substantial evidence supports that conclusion, we must view the facts in the light most favorable to that conclusion." (*People v. Mejia* (2017) 9 Cal.App.5th 1036, 1046.)

Here, considering the evidence in a light most favorable for a finding of separate intent and objectives, we conclude substantial evidence supports that finding. While the three acts the jury found to constitute witness threatening could have been in aid of the robbery, that does not preclude a finding that they were also done with the objective of threating a witness for a different purpose. Indeed, defendant's intent to terrorize the victim and make her suffer is shown throughout the incident. When he was being released from custody, he repeatedly called her. Shortly after she picked him up, he punched her in the eye several times. At the restaurant, he took her iPhone and broke it.

11

Back in the car he punched her again, before humiliating her in front of his son: " 'This is what happens to stupid bitches.' "

Accordingly, the evidence supports either a finding that defendant performed the special-findings acts in order to threaten the victim, or he did so with the dual motive of threatening the victim and furthering a robbery. In either case, the finding of separate objectives for section 654 purposes is supported by substantial evidence.

## IV.  Senate Bill No. 1393

Defendant next contends remand is required to allow the trial court to consider exercising its discretion to strike his five-year prior serious felony enhancement, pursuant to SB 1393. While the People agree SB 1393 applies retroactively to defendant, the People maintain remand is inappropriate because, at sentencing, the trial court indicated it would not have dismissed the prior serious felony enhancement even if it had the power to do so. We agree with the People.

### A.  Additional Background

Before sentencing, the trial court explained: "This is a serious case, because the victim had been a — this is the third time, okay. And this time there was significant injury, requiring up to four eye surgeries. She has double vision, she testified here. [The victim] indicates she still has that all these months later, and *it's hard to find any justification for anything but the maximum sentence allowed by law. And I believe it's appropriate*, given the egregious nature, given the victim's three time status as a victim, and given the Defendant's inability to control his behavior, certainly on this case, with this injury to her eye. [¶] So, in keeping with that, I would sentence the Defendant as follows." (Italics added.) The court went on to impose the aggregate 29-year eight-month term, including the five-year section 667, subdivision (a) enhancement.

### B.  Analysis

Effective January 1, 2019, SB 1393 authorized a trial court to strike, in the interest of justice, a section 667, subdivision (a) prior serious felony enhancement, and it applies

12

retroactively to cases not yet final.  (*People v. Jones* (2019) 32 Cal.App.5th 267, 273 (*Jones*); *People v. Garcia* (2018) 28 Cal.App.5th 961, 973.)

Though SB 1393 applies retroactively to defendant, we agree the trial court's statements clearly indicate remand is not appropriate because the court would not have exercised discretion to strike the enhancement if it could.  "The trial court need not have specifically stated at sentencing it would not strike the enhancement if it had the discretion to do so.  Rather, we review the trial court's statements and sentencing decisions to infer what its intent would have been." (*Jones*, *supra,* 32 Cal.App.5th at p. 273.)  The italicized portion of the above statement the court made at sentencing indicates the court thought "the maximum sentence allowed by law" is "appropriate" here.  Our conclusion that the court would not strike the prior serious felony allegation is bolstered by the fact that no circumstances in mitigation are cited in the probation report to apply to an interest of justice analysis under section 1385, subdivision (a).  We therefore need not remand.

### V.  Senate Bill No. 136

Defendant contends his one-year prior prison term enhancement (§ 667.4, subd. (b)) must be stricken in light of SB 136.  The People concede the issue, and we agree.

SB 136 became effective on January 1, 2020 and amends section 667.5 subdivision (b) to authorize a one-year prior prison term enhancement only if a defendant served a prior prison term for a sexually violent offense.  It applies retroactively to defendants whose judgments are not yet final.  (*People v. Lopez* (2019) 42 Cal.App.5th 337, 341.)

Here, defendant's prior prison term, for corporal injury to a spouse, did not arise from a sexually violent offense.  We will therefore modify the judgment to strike the enhancement.

13

## VI. Dueñas

Defendant contends remand is required for an ability to pay hearing. He cites in support *Dueñas, supra,* 30 Cal.App.5th 1157, which held due process requires the trial court to stay execution of restitution fines, as well as court operation and conviction assessments, until it has held a hearing and determined the defendant has the present ability to pay. The People respond that defendant has forfeited his constitutional claim by failing to raise it before the trial court. And further, the court was expressly allowed to consider his ability to pay in setting the amount of the restitution fine and even so, defendant did not object.

It has always been the case that section 1202.4 allowed consideration of a defendant's ability to pay when determining whether to increase the restitution fines above the statutory minimum. (§ 1202.4, subd. (c).) Here, the trial court imposed restitution fines in the amount of $10,000, the statutory maximum. Yet, defendant did not object based on an inability to pay, forfeiting his challenge to this fine on those grounds in this appeal.[10] (*People v. Avila* (2009) 46 Cal.4th 680, 729; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1032-1033; *People v. Frandsen* (2019) 33 Cal.App.5th 1126,1133.) We further conclude that defendant forfeited his ability to pay claim as to the two mandatory assessments. (*Gutierrez*, at p. 1033 ["As a practical matter, if [defendant] chose not to object to a $ 10,000 restitution fine based on an inability to pay, he surely would not complain on similar grounds regarding an additional $1,300 in fees"].)

---

[10] While counsel did not object, defendant did say "I object" after the court imposed the parole revocation restitution fine. The record is not clear whether he was objecting to both the restitution fine and the parole revocation restitution fine or just the latter. In any event, he did not state any grounds for his objection, so even if defendant's personal objection is cognizable, it is still forfeited.

## VII. Ineffective Assistance of Counsel

Finally, defendant contends his trial counsel rendered ineffective assistance in failing to investigate and pursue evidence that the victim previously made false accusations against him. He points to the victim's November 2015 sworn statement that she went to the Alameda County Sheriff Station, in late October 2015, and filed a false police report against defendant. He argues that had the jury known this, it would explain "why there were no witnesses or evidence that displayed any of the alleged victim injuries the two days and night she was with [defendant]"; why she hugged defendant in the pawnshop; why she had multiple chances to escape or seek help, but did not; why defendant took her to the probation office; and why the victim continued to contact defendant after he was arrested. We find no ineffective assistance.

### A. Additional Background

At a *Marsden*[11] hearing, defendant told the trial court he had been having trouble with his attorney "since the beginning." He complained about not getting discovery and preliminary hearing transcripts. He said he hadn't discussed strategy with his attorney. He said the victim "wrote a letter in the past and bailed me out several times out of jail because she lied," adding the "evidence is in Alameda County." And defendant mentioned two witnesses, as well as his mother and brother, who would say the victim is a liar and fabricated the charged incident.

Defendant's trial counsel responded by discussing the reports defendant had and had not been provided. She explained that they had discussed strategy, impeachment, and how his prior convictions would affect his case. She also explained that her investigator spoke to one of defendant's requested witnesses, but the witness did not see what happened — the witness's son, however, watched defendant take the victim's phone

---

[11] *People v. Marsden* (1970) 2 Cal.3d 118.

and hit the victim. Counsel explained that another requested witness could only corroborate the victim's version. Defendant's mother could only provide hearsay that the victim may have taken some of defendant's money. And defendant's brother could add nothing significant.

After asking about the purported witnesses, the court asked counsel, "Anything else you want to add that comes to mind?" Counsel responded, "I don't believe so. I think that's pretty much it."

While the record discloses that the trial court asked specific questions concerning the proffered witnesses, the court never specifically asked counsel about the letter or what her intent or strategy was relative to it. Counsel did not discuss the victim's letter, and neither defendant nor the court noted the omission. In fact, defendant's singular focus appeared to be that preliminary hearing transcripts had not been provided — he complained about that no fewer than five times after counsel discussed his proffered witnesses. He never returned to the subject of the letter or provided any more information about it to the court. And defendant became disruptive. The trial court twice stated it was holding defendant in contempt of court.[12] After having defendant removed from the courtroom and later bringing him back, the court denied the *Marsden* motion.

---

[12] At one point, the trial court suggested defendant should calm down and get focused on his case. Defendant responded: "How can I get focused on the case if I can't get my fucking transcripts? You fucking asshole and you fucking know it, dude." Just before the second time the court indicated it was holding defendant in contempt, defendant told the trial court: "Kiss my ass, man, fucking asshole." Later, the trial court said it would not hold defendant in contempt, noting that he was already "looking at a lot of time" and encouraging defendant to behave. The court explained: "So I need you to behave and if you can't, and this is the last time I'm going to say it. I'm going to have to have you step out, and you don't want to do that if front of the jury because that's not good."

## B. Analysis

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*). " 'Surmounting *Strickland's* high bar is never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105, [178 L.Ed.2d 624, 642] (*Richter*).) The reason *Strickland's* bar is high is because "[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. [Citation.] . . . It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' " (*Richter*, *supra*, 562 U.S. at p. 105.)

As for *Strickland's* deficient performance prong, "[t]he question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." (*Ibid*.) "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) *counsel was asked for a reason and failed to provide one*, or (3) there simply could be no satisfactory explanation." (*People v. Hung Thanh Mai* (2013) 57 Cal.4th 986, 1009, italics added.)

As for the prejudice prong, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Richter*, *supra*, 562 U.S. at p. 104.) A defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland*, *supra*, 466 U.S. at pp. 693-694; *Ledesma*, *supra*, 43 Cal.3d 171, at pp. 217-218.) "A reasonable

probability is a probability sufficient to undermine confidence in the outcome."
(*Strickland*, *supra*, 466 U.S. at p. 694; accord, *Ledesma*, *supra*, 43 Cal.3d at p. 218.)
"The likelihood of a different result must be substantial, not just conceivable." (*Richter*,
*supra*, 562 U.S. at p. 112; *People v. Rogers* (2016) 245 Cal.App.4th 1353, 1367.)

Here defendant can show neither prong. Defendant argues counsel never
explained why she did not pursue the victim's statement because no satisfactory
explanation exists. But counsel was not expressly asked to provide a reason for not using
the statement or even if she had crystalized thoughts on what she might do with it at the
time of the *Marsden* hearing.[13] In any event, an explanation for not using it is readily
apparent to us. The recantation statement pertains to a police report made in October
2015. And according to the prosecution's motion to admit prior acts of domestic
violence, in October 2015, defendant threatened to kill the victim, and as a result, his
probation was violated. That incident, however, was excluded from the trial by the trial
court. Counsel therefore may well have opted not to pursue the sworn statement as it
would lead to the jury hearing about yet another act of domestic violence defendant
perpetrated against the victim and the circumstances of the recantation. And from the
admissible evidence showing defendant's control over the victim, counsel may have
reasoned the jury would conclude defendant coerced the victim into signing the sworn
statement.

Additionally, prejudice is not shown. That the victim signed a statement admitting
to filing a false police report several years before the charged incident would carry little

---

[13] At oral argument, appellate counsel said he thought the trial court had specifically
asked about the statement. We have re-reviewed the transcript of the *Marsden*
proceeding and, as we have noted, the record discloses that the trial court did not
specifically ask counsel about her intent or strategy concerning the letter. Neither the
trial court nor counsel can be faulted for this omission given defendant's disruptive
behavior and the obvious distraction it created.

weight here. First, overwhelming evidence, including the very serious injury defendant inflicted to the victim's eye, supported the convictions in the instant case. Second, the record shows numerous instances of defendant exerting control over the victim — from making her pick him up from the bus station, to taking her keys and driving her car, to making her sell her possessions. A jury would therefore likely give little credence to a signed statement of the victim claiming she falsely accused defendant.

Defendant has failed to establish ineffective assistance of counsel.

## DISPOSITION

The judgment is modified to (1) strike the conviction on Count 6, false imprisonment (Pen. Code, § 236), and the accompanying one-year eight-month term; and (2) strike the one-year Penal Code section 667.5, subdivision (b) prior prison term enhancement. As modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment and to send a certified copy to the Department of Corrections and Rehabilitation.


　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　MURRAY, J.



I concur:



　　　/s/
KRAUSE, J.


19

MAURO, Acting P. J., Concurring and Dissenting.


I fully concur in the majority opinion except for part VI of the Discussion, pertaining to the restitution fines and assessments. As to that portion of the opinion, I dissent in part.

In *People v. Dueñas* (2019) 30 Cal.App.5th 1157, the court held it is improper to impose certain fines or assessments without determining defendant's ability to pay. (*Id*. at pp. 1168, 1172.) Although some courts have subsequently criticized *Dueñas*'s legal analysis (see, e.g., *People v. Hicks* (2019) 40 Cal.App.5th 320, review granted Nov. 26, 2019, S258946), *Dueñas* remains citable precedent. Until the California Supreme Court has had an opportunity to resolve the current split in authority, I would remand the matter to give the trial court an opportunity to consider defendant's ability to pay the imposed assessments. But as for the restitution fines imposed by the trial court, I would conclude defendant forfeited the challenge to the fines because they were imposed above the minimum and defendant had an opportunity to object to them in the trial court but did not.


                                        /s/
                              MAURO, Acting P. J.

1